UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

STEPHEN L. KEARLY,

     Plaintiff,

vs.                                    CIVIL NO.: 05-CV-72176-DT

COMMISSIONER OF                HON. ROBERT H. CLELAND
SOCIAL SECURITY,                MAG. JUDGE WALLACE CAPEL, JR.

     Defendant.
_____/

## REPORT AND RECOMMENDATION

**I.    RECOMMENDATION**

It is recommended that the Court grant Plaintiff's Motion for Summary Judgment in part, deny Defendant's Motion for Summary Judgment, and remand this case for proceedings consistent with this Report.

**II.    REPORT**

This is an action for judicial review of the Defendant Commissioner's final decision denying Plaintiff's application for disability insurance benefits. Plaintiff signed his application for benefits on August 1, 2001, alleging that he has been disabled and unable to work since July 21, 2001, due to a "bad heart" (arterial sclerosis), emphysema, herniated disc, arthritis, high blood pressure, left hip replacement, light headedness, shortness of breath, and loss of strength in arms and legs. (TR 42-46, 56).[1] The SSA denied benefits initially on January 29, 2002. (TR 28-33). A de novo hearing was held on June 2, 2003, before Administrative Law Judge [ALJ] John A. Ransom. (TR 283-96).

---

[1] Plaintiff's application was actually filed by the Social Security Administration [SSA] on August 13, 2001. (TR 28).

In a decision dated July 24, 2003, the ALJ found that Plaintiff was not disabled. (TR 16-24). The Appeals Council denied a request to review the decision on April 15, 2005. (TR 6-8). The Plaintiff has commenced this action for judicial review.

### A.     TESTIMONY

Plaintiff testified that he was born on September 2, 1949, and was fifty-three at the time of the hearing. (TR 286). He stated that he has an associates degree in education from Albina Community College where he attended from 1967 to 1969. Id. He reported that he never used his degree in any employment. Id.

Plaintiff stated that he is married and lives in a house. (TR 291). He reported a pension of $1,700 a month. Id. He stated that he has a driver's license and is able to drive short distances. Id. He stated that he has problems sitting, standing, and walking. Id. He stated that he can sit for a half-hour to forty-five minutes. (TR 291-92). He stated that he can stand about five or ten minutes at a time. (TR 292). He stated that he cannot walk because his "hips hurt really bad." Id.

He stated that he is able to care for himself. Id. He stated that he tries to help his wife with household chores; for example, he tries to set the kitchen table. Id. He stated that he does not do dishes, cooking, dusting, vacuuming, or laundry because of his neck and back pain. Id. He stated that as far as grocery shopping, he goes to the store and picks up small items. Id. He stated that his wife does the rest of the chores. Id. He stated that he does not participate in social activities other than the Eagles club, which is close to his home. Id. He stated that he does very little yard work. (TR 292-93). He reported that either his wife or son will mow the lawn and water the flowers. (TR 293).

He stated that he last worked for the City of Ypsilanti on June 19, 2001. (TR 286-87). He testified that that was the day he went to the hospital to have an operation for diverticulitis. (TR 287). He explained that he thought he would be returning to work after that, but had a hernia after the surgery. Id. Further, he stated that he suffered from various conditions throughout the years. Id. He stated that his main condition was fatigue due to his heart condition. Id. He stated that he tried working with the fatigue, but it got worse. (TR 287-88). He testified that "during the course of the workday, I would just become extremely tired. Most of our work was labor type work, and I just didn't feel I could do my job the way it should be done." (TR 288). He stated that he did not think he could do other types of work because of his fatigue and loss of breath, which has worsened over the years. Id.

Plaintiff described a typical day since June 19, 2001. (TR 288-89). He stated that

> I wake up early in the morning, 4:30, 5:00. I watch TV, drink coffee. Sometimes I go to the store and get money orders or sometimes I'll go out to the local Eagles club, get a cup of coffee, talk with some of the people that are retired. Usually I'll have breakfast and usually in the afternoon - - well, almost every day I take a nap.

Id. He stated that he naps for an hour or two sometimes twice a day because he is tired and "wore out." (TR 289).

Other than fatigue, Plaintiff stated that his arthritis bothers him in his neck, lower back, hips, and knees. Id. He reported that he avoids lifting anything because it causes pain in his neck and lower back. Id. He explained that just standing causes pain in his lower back. Id. He stated that he has constant pain during the daytime. Id.

Plaintiff stated that he used to love golf and would golf four or five times a week. (TR 290). He stated that he did not plan to golf this year, but his 30 year partner begged him to. Id. He stated that his partner has cancer, cataracts, and is in worse shape than himself. Id. He stated that he plays

3

nine holes, once a week with a cart. (TR 290, 291). He reported that the golf league refers to them as "the medical cart." (TR 290). He stated that after golfing he goes home and lays down for about an hour. Id. He stated he only golfs because he loves it. Id.

He stated that he also has shortness of breath. (TR 293). He stated that he smokes two packs a day. Id. He reported that in addition to the medications he's listed, he also takes albuterol. Id. He stated that he does not have any side effects to his medications. Id. Plaintiff stated that he does not think that there is any work that he could do and that if he could work, he would work. (TR 291).

### B.  MEDICAL EVIDENCE

Examination of the parties' cross-motions for summary judgment reveals that an additional recitation of the Plaintiff's medical evidence would be repetitive. The pertinent record medical evidence relied upon by this Court is fully articulated in the Analysis.[2]

### C.  VOCATIONAL EXPERT'S TESTIMONY

Ann Tremblay, a vocational expert [VE], testified at the hearing. (TR 293-95). The VE stated that Plaintiff had no transferable skills. (TR 294). The ALJ asked the VE to assume Plaintiff's age, education, work experience, and that his testimony regarding his limitations and impairments are fully credible. Id. The VE testified that Plaintiff's alleged need to lay down twice a day due to fatigue would preclude all work. Id.

The ALJ presented a second hypothetical question to the VE in which a claimant with Plaintiff's age, education, and work experience "required a sit/stand option; no repetitive bending, twisting, turning, pushing, or pulling; no overhead work; no prolonged or repetitive rotation, flexion, or extension of his neck; and a controlled environment." Id. The VE testified that such a claimant

---

[2]See Subpart E, infra, page 5.

would be capable of the following light, unskilled work: inspector, reduced number of 7,000 positions; assembler, reduced number of 14,000 positions; and order clerk, 2,400 positions. (TR 295). The VE stated that her testimony was consistent with the Dictionary of Occupational Titles. Id. Plaintiff's counsel declined to question the VE. Id.

### D.     ALJ'S CONCLUSIONS

After reviewing the testimony presented at the hearing and the medical evidence in the record, the ALJ found that "the claimant has chronic obstructive pulmonary disease, arthritis, coronary artery disease status-post three-vessel coronary artery bypass in August 1993, degenerative disc disease of the cervical and lumbar spine and osteoarthritis of both knees." (TR 20, 23). The ALJ determined that although he has impairments that are severe within the meaning of the Regulations, he does not have an impairment or combination of impairments set forth in Appendix 1, Subpart P, Regulations No. 4. Id. The ALJ found Plaintiff's testimony not to be totally credible. (TR 20-21, 23). He determined that Plaintiff had the residual functional capacity [RFC] to perform

> light work, or work that requires occasional lifting of up to twenty pounds and frequent lifting of up to ten pounds. The claimant requires the option to sit or stand. He can not perform repetitive bending, twisting, turning, pushing or pulling. The claimant requires a controlled environment and can not perform overhead work tasks. He can perform no prolonged or repetitive rotation, flexion or extension of the neck.

(TR 21, 23-24). Thus, the ALJ concluded that Plaintiff is not eligible for disability. (TR 23-24).

### E.     ANALYSIS

Plaintiff advances two main claims in his Motion for Summary Judgment. Plaintiff's Motion argues that the ALJ's decision is not supported by substantial record evidence because: (1) the ALJ failed to give appropriate weight to Plaintiff's treating physician; and (2) the ALJ completely ignored

Plaintiff's cardiac stress test of September 27, 2002.[3]  In response, Defendant's Motion for Summary Judgment contends that the ALJ's decision is supported by substantial evidence.[4]  The matter is now ready for decision.

### 1. Standard of Review

This Court's review of the ALJ's conclusions is limited.  The findings of the ALJ regarding Plaintiff's disabled status are conclusive if supported by substantial evidence based on the record as a whole.  42 U.S.C. § 405(g) (1997).  Substantial evidence means such evidence as a reasonable mind might accept as adequate to support a conclusion.  Richardson v. Perales, 402 U.S. 389, 401 (1971).

---

[3] Plaintiff's Motion for Summary Judgment and Brief filed August 26, 2005 (hereinafter "Plaintiff's Brief"), at pages 8-14.  Plaintiff also argues that the burden shifted "to the Commissioner to show by substantial evidence that he had the residual capacity to perform other gainful employment."  Plaintiff's Brief at page 8. (citations omitted).  However, as Defendant aptly points out:

> Plaintiff misstates the burden of proof in this case. Insofar as he claims that the Commissioner has the burden to determine Plaintiff's RFC at step five of the sequential evaluation, Plaintiff is incorrect. See Pl.'s Br. at 8.  In a Social Security case, a claimant shoulders the dual burdens of production and persuasion through step four of the sequential analysis, see Bowen v. Yuckert, 482 U.S. 137, 146 n.5 (1987), which includes the claimant's RFC, see 20 C.F.R. §§ 404.1520(e)-(f), 404.1545. Yuckert is consistent with the Social Security Act, which provides that "[a]n individual shall not be considered to be under a disability unless he furnishes such medical and other evidence of the existence thereof as the Commissioner of Social Security may require," 42 U.S.C. § 423(d)(5)(A), and with agency regulations stating that "[i]n general, you have to prove to us that you are blind or disabled," 20 C.F.R. § 404.1512(a). At step five, the burden of production shifts to the Commissioner to come forward with evidence of a significant number of jobs that a person with the claimant's RFC and vocational characteristics can perform, evidence which is unavailable to most claimants. See Ratliff v. Celebrezze, 338 F.2d 978 (6th Cir. 1964). The ultimate burden of persuasion to prove disability, however, remains with the claimant.  See Roth v. Shalala, 45 F.3d 279 (8th Cir. 1995).

Defendant's Motion for Summary Judgment and Brief filed November 22, 2005 (hereinafter "Defendant's Brief"), at page 5.  Thus, further discussion of Plaintiff's allegation regarding same are unwarranted.

[4] Defendant's Brief at pages 4-17.

6

It is more than a scintilla of evidence, but less than a preponderance of evidence. Brainard v. Sec'y of Health and Human Servs., 889 F.2d 679, 681 (6th Cir. 1989). This standard presupposes that there is a "zone of choice" within which the ALJ may make a decision without being reversed. Felisky v. Bowen, 35 F.3d 1027, 1035 (6th Cir. 1994). Even if the court might arrive at a different conclusion, an administrative decision must be affirmed if it is supported by substantial evidence. Mullen v. Bowen, 800 F.2d 535, 545 (6th Cir. 1986). Finally, consideration of the whole record does not mean that the ALJ must mention or comment on each piece of evidence submitted. Black v. Apfel, 143 F.3d 383, 386 (8th Cir. 1998). Applying these standards, I will analyze Plaintiff's claim.

### a. Treating Physician

Plaintiff alleges that the ALJ failed to accord appropriate weight to the opinion of his treating physician, Dr. Lawrence Abramson.[5] The medical opinions and diagnoses of treating physicians are entitled to substantial deference, particularly if those opinions are uncontradicted. King v. Heckler, 742 F.2d 968, 974 (6th Cir. 1984). However, this is true only if the treating physician's opinion is based on sufficient medical data. See 20 C.F.R. § 404.1529. It is often misunderstood that the determination of disability is the prerogative of the Secretary, and not the treating physician. Kirk v. Sec'y. of Health & Human Servs., 667 F.2d 524, 538 (6th Cir. 1981); Duncan, 801 F.2d 847, 855 (6th Circ. 1986); 20 C.F.R. § 404.1527. An ALJ may reject a physician's opinion when it is brief, conclusory, or not supported by medically acceptable clinical or laboratory diagnosis techniques. 20 C.F.R. § 404.1527(d)(2). Accordingly, treating physicians' opinions must be grounded on objective medical evidence, and no deference need be afforded those opinions if they are simply conclusory. Houston v. Sec'y of Health and Human Servs., 736 F.2d 365, 367 (6th Cir. 1984); Duncan, 801 F.2d

---

[5]Plaintiff's Brief at pages 9-11.

at 855 (citing King, 742 F.2d at 973).  In other words, the weight to be given a doctor's opinion by an ALJ will depend on the extent to which it is supported by "specific and complete clinical findings."  Giddings v. Richardson, 480 F.2d 652, 656 (6th Cir. 1973).  See also, Cutlip v. Sec'y of Health and Human Servs., 25 F.3d 284, 287 (6th Cir. 1994) (citing Young v. Sec'y of Health & Human Servs., 925 F.2d 146, 151 (6th Cir.1990)).

As Plaintiff points out,[6] in Wilson v. Comm'r of Soc. Sec., 378 F.3d 541, 544 (6th Cir. 2004), the Sixth Circuit found that an ALJ must give "good reasons" for rejecting a treating physician's opinion.

Wilson, 378 F.3d at 544.  However, the Regulations clearly state that, "[a] statement by a medical source that you are 'disabled' or 'unable to work' does not mean that we will determine that you are disabled."  20 C.F.R. § 404.1527(e)(1).  Nonetheless, although an ALJ is not required to discuss each and every piece of evidence, he or she "may not pick and choose the portions of a single report, relying on some and ignoring others, without offering some rationale for his decision."  Young v. Comm'r of Soc. Sec., 351 F.Supp.2d 644, 649 (E.D. Mich. 2004).

In Wilson, the Sixth Circuit went on to state

> [t]hat is not to say that a violation of the procedural requirement of § 1527(d)(2) could never constitute harmless error.  We do not decide the question of whether a de minimis violation may qualify as harmless error.  For instance, if a treating source's opinion is so patently deficient that the Commissioner could not possibly credit it, a failure to observe § 1527(d)(2) may not warrant reversal.  NLRB v. Wyman-Gordon, Co., 394 U.S. 759, 766 n. 6, 89 S.Ct. 1426, 22 L.Ed.2d 709 (1969) (plurality opinion) (where "remand would be an idle and useless formality," courts are not required to "convert judicial review of agency action into a ping-pong game"). There is also the possibility that if the Commissioner adopts the opinion of the treating source or makes findings consistent with the opinion, it may be irrelevant that the ALJ did not give weight to the treating physician's opinion, and the failure to give reasons for not giving such weight is correspondingly irrelevant.  Or perhaps a situation could arise

---

[6]Plaintiff's Brief at page 11.

8

> where the Commissioner has met the goal of § 1527(d)(2)-- the provision of the procedural safeguard of reasons--even though she has not complied with the terms of the regulation.

Wilson, 378 F.3d at 547. In the present case, the ALJ did consider Dr. Abramson's medical opinion.

He stated

> [t]he undersigned has carefully considered the finding of the State Agency but has not given this determination significant weight in light of the additional evidence that has been obtained. The undersigned has also considered the May 2003 statement of Lawrence Abramson, M.D. that is contained in exhibit 23F. Social Security Ruling 96-5p, as well as § 404.1527(e) of the Regulations, provides that the ultimate determination of disability under the Social Security Act and Regulations is reserved to the Administration and that opinions by others on issues reserved to the Administration are not entitled to special significance. While the undersigned has considered Dr. Abramson's statement and the accompanying x-rays reports contained in exhibit 23F, the undersigned is unable to accept the conclusory statement of the doctor that the claimant is unable to sustain gainful employment. The evaluation of disability under the Social Security Ruling 96-7p provides that an individual's residual functional capacity can only reflect limitations that are medically reasonable and can not be based on his body habitus, activities that the claimant is accustomed to performing or other factors. While the doctor listed the claimant's impairments and the claimant's subjective symptoms, the doctor did not offer specific limitations in the claimant's ability to perform basic work activities or provide a rationale to support his proposed conclusion.

(TR 21). However,

> [i]f the opinion of a treating source is not accorded controlling weight, an ALJ must apply certain factors--namely, the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and the specialization of the treating source--in determining what weight to give the opinion. Id.

Wilson, 378 F.3d at 544. First, Dr. Abramson is not a specialist, he is an internist. (TR 228).

Nonetheless, he did treat Plaintiff from 1992 until November 2001, and evaluated his condition again

in May 2003. (TR 204-34, 262-70). Thus, Defendant is correct in asserting that there was a lapse in treatment as reflected in the record during 2002 and the beginning of 2003.[7]

Further, the treating physician finds that Plaintiff has limitations not included by the ALJ in his RFC. These include chronic fatigue, lifting, strength, and walking limitations. (TR 263). The ALJ notes these limitations, but it bears repeating that he finds that they do not describe "specific limitations in the claimant's ability to perform basic work activities or provide a rationale to support his proposed conclusion." (TR 21).

The opinion *is* supported by objective medical data and herein lies the rub. The ALJ specifically noted that he considered Dr. Abramson's opinion as well as "the accompanying x-rays reports contained in exhibit 23F," but does not mention his review of the stress test in September 2002, cited by the doctor. (TR 21, 261-62). Thus, the question becomes whether the September 27, 2002, stress test is of any consequence.

### b.      September 27, 2002, Stress Test

Plaintiff argues that his most debilitating impairment is his heart condition and that the ALJ completely ignored an important test regarding same, namely, a stress test performed on September 27, 2002.[8] (TR 261).

The ALJ did note that Plaintiff had a stress test performed in April 2001, and stated that it "showed an ejection fraction of 51% with an inferolateral regional wall motion abnormality and a medium size inferoseptal, inferior, inferolateral, partially reversible defect that was suggestive of ischemia and possibly mixed with an infarction." (TR 18; see also TR 142). The unmentioned stress

---

[7]Defendant's Brief at page 10.

[8]Plaintiff's Brief at pages 12-14.

test, performed approximately one and a half years later, compared the two tests. It noted that "[c]ompared to the previous study on 4/25/2001, there is now a small area of anterolateral ischemia and the left ventricle has dilated with a decrease in the left ventricular function." (TR 261). The ejection fraction decreased from 51% in April 2001, to 28% in September 2002.[9] (Compare TR 142 with TR 261). The ALJ failed to note this change.

Defendant argues that "[t]he medical literature makes clear that a poor ejection fraction, while potentially ominous, does not necessarily show the nature of a claimant's cardiac condition. See, e.g., http://www.uth.tmc.edu/pet/PDF/Spring_2005.pdf. One test may represent an anomaly; or there may be measures that can improve the underlying condition."[10] Further, Defendant argues that there are no records interpreting Plaintiff's results in this regard.[11] However, the same source Plaintiff cites also states that

> [a] normal ejection fraction (EF) is 50% or more. When approximately 23% of heart muscle is damaged and stops contracting, the EF falls below 50%. With progressive heart damage, the EF may fall further with inadequate blood flow pumped to the body by the damaged heart. This reduced cardiac output causes symptoms of fatigue, limited exercise capacity, difficulty breathing, ankle swelling, and shortened life span. A decreased EF is therefore a predictor of heart failure and shortened lifespan in cardiac patients.

Further, the significance of an ejection fraction has been recognized within the Sixth Circuit. Diamond v. Comm'r of Soc. Sec., 154 Fed.Appx. 478, 480, 2005 WL 3077132, *1 (6th Cir. 2005) (unpublished) ("A normal ejection fraction is greater than 55%, and an ejection fraction of below 30%, when accompanied by other symptoms, qualifies as a presumptive disability under the Act. See

---

[9]See discussion infra pp. 11-12.

[10]Defendant's Brief at page 10.

[11]Defendant's Brief at page 10.

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 4.02B (2005)."). Nevertheless, in <u>Larose v. Sec'y of Health and Human Servs.</u>, 1992 WL 227588, *5, 7 (E.D.Mich. 1992) (unpublished), the district court noted that

> [t]he doctor's summary statement of a reduced ejection fraction of "approximately 30 percent" is of little value to plaintiff in this context. Rather, it was in the Secretary's discretion to evaluate the discrepancy in the report and conclude that the ejection fraction was greater than the 30 percent threshold and that, therefore, plaintiff did not meet that criterion. . . . the Court notes that the magistrate judge's report concluded that the Secretary erred by excluding this evidence, Dr. Prasad's summary report, when he relied solely on the treadmill test results. That the Secretary's decision was neither arbitrary nor capricious is borne out by the fact that this evidence did not meet any of the criteria under 4.04 and therefore did not affect the significance of the treadmill test results.

Nevertheless, the ALJ clearly did not evaluate the ejection fraction in the present case and there is no evidence in the record that the ALJ even reviewed it. Although he does discuss Dr. Abramson's letter, he does not note anything regarding this crucial test. (TR 21).

However, the ALJ does state that in May 2003, an x-ray report attached to that letter "showed a stable, at least moderate, enlargement of the cardiopericardial silhouette without overt signs of congestive heart failure." (TR 20). Obviously, this is in conflict with the September 27, 2002, stress test. The ALJ apparently gave this x-ray great weight in his discretion. It is not the job of the undersigned "to resolve conflicting evidence in the record." <u>Wright v. Massanari</u>, 321 F.3d 611, 614 (6th Cir.2003). Further, "[t]he fact that a record may also possess substantial evidence to support a different conclusion than that reached by the ALJ, or that the reviewing judge might have decided the case differently, is irrelevant." <u>Crisp v. Sec'y of Health and Human Servs.</u>, 790 F.2d 450, 453 n. 4 (6th Cir.1986). Thus, it does not appear that this case can be remanded on the failure to discuss the stress test at issue alone.

However, Plaintiff does argue

> that the findings of this Stress Test are, in themselves, sufficient to establish the existence of a cardiac condition severe enough to establish disability. It was specifically cited by Dr. Abramson in support of his findings and opinion; and it medically explains the fatigue of which Mr. Kearly and Dr. Abramson speak, and Plaintiff's need to lay down and rest during the day."[12]

The ALJ did find that Plaintiff was not credible regarding his need to lie down and nap during the day due to fatigue.[13] (TR 20-21). The VE testified that same would preclude all work. (TR 294). An ejection fraction of 28% would explain the fatigue and the ALJ failed to consider same. Thus, it is suggested that his decision lacks substantial support in this regard.

### 2. Remand Versus Benefits

The remaining issue is whether remand or an award of benefits is the appropriate remedy for Plaintiff. It is firmly established that under § 405(g), a court may remand for an award of benefits "only if all essential factual issues have been resolved and the record adequately establishes a plaintiff's entitlement to benefits." Faucher v. Sec'y of Health & Human Servs., 17 F.3d 171, 174 (6th Cir. 1994)(citations omitted). More specifically, "[a] judicial award of benefits is proper only where the proof of disability is overwhelming or where the proof of disability is strong and evidence to the contrary is lacking." Id. (citing Mowery v. Heckler, 771 F.2d 966, 973 (6th Cir. 1985)).

Here, the ALJ's adverse decision was deprived of substantial evidentiary support because although the ALJ did consider the treating physician's opinion of disability, he failed to note the reference to the September 27, 2002, stress test and evaluate same. Specifically, he found that Plaintiff was not credible regarding various factors, namely, his alleged fatigue. However, evidence that the ALJ

---

[12]Plaintiff's Brief at pages 13-14.

[13]The ALJ did note that Plaintiff plays nine holes of golf weekly. (TR 20). However, Plaintiff testified that after doing so he lies down for about an hour. (TR 290).

did not consider would support a finding of increased fatiguability. Therefore, it is recommended that this case be remanded for the ALJ to determine whether this evidence would change his credibility determination regarding fatigue.

### III.  CONCLUSION

For the reasons stated, I respectfully recommend that the court **GRANT** Plaintiff's Motion for Summary Judgment **IN PART**, **DENY** Defendant's Motion for Summary Judgment, and **REMAND** this case to the Defendant Commissioner for further proceedings consistent with this Report.

### IV.  REVIEW

Either party to this action may object to and seek review of this Report and Recommendation, but must act within ten days of service of a copy hereof as provided for in 28 U.S.C. section 636(b)(1) and E.D. Mich. LR 72.1(d)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. United States v. Walters, 638 F.2d 947 (6th Cir. 1981), Thomas v. Arn, 474 U.S. 140 (1985), Howard v. Secretary of HHS, 932 F.2d 505 (6th Cir. 1991). Filing objections which raise some issues but fail to raise others with specificity will not preserve all objections that party might have to this Report and Recommendation. Smith v. Detroit Fed'n of Teachers Local 231, 829 F.2d 1370, 1373 (6th Cir. 1987), Willis v. Secretary of HHS, 931 F.2d 390, 401 (6th Cir. 1991). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objection must be served upon this Magistrate Judge.

*Note this especially, at the direction of Judge Cleland:* any objections must be labeled as "Objection #1," "Objection #2," etc.; any objection must recite *precisely* the provision of this Report and Recommendation to which it pertains. Not later than ten days after service an objection, the

opposing party must file a concise response proportionate to the objections in length and complexity. The response must specifically address each issue raised in the objections, in the same order and labeled as "Response to Objection #1," "Response to Objection #2," etc.

In accordance with the provisions of Fed.R.Civ.P. 6(b), the court in its discretion, may enlarge the period of time in which to file objections to this report.

                                       s/Wallace Capel, Jr.
                                       **WALLACE CAPEL, JR.**
                                       **UNITED STATES MAGISTRATE JUDGE**

**Dated:**   May 31, 2006

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**

**CERTIFICATE OF SERVICE**

I hereby certify that on May 31, 2006, I electronically filed the foregoing paper with the Clerk of the Court using the ECF system which will send notification of such filing to the following: James A. Brunson,

and I hereby certify that I have mailed by United States Postal Service the paper to the following non-ECF participant(s):  Lawrence W. Sperling, and the Social Security Administration.

                                                s/James P. Peltier
                                                United States District Court
                                                Flint, Michigan 48502
                                                810-341-7850
                                                E-mail:  pete_peltier@mied.uscourts.gov